Worley v. Moore, 2017 NCBC 15.

STATE OF NORTH CAROLINA

COUNTY OF COLUMBUS

DENNIS WORLEY, STERLING
KOONCE, FLYING A LIMITED
PARTNERSHIP L.P., JOSEPH W.
FORBES, JR., KENNETH CLARK,
JAMES BOGGESS, JOEL WEBB,
JAIMIE LIVINGSTON, JAMES E.
BENNETT, JR., DAVID MINER,
RONALD ENGLISH, and MDF, LLC,

Plaintiffs,

v.

ROY J. MOORE, PIERCE J.
ROBERTS, DAVID BROWN,
MICHAEL ADAMS, CHRISTOPHER
BAKER, JAMES KERR, FRANK
MCCAMANT, NEIL KELLEN, GINI
COYLE, JOSEPH MOWERY,
TOSHIBA CORPORATION, ALAMO
ACQUISITION CORP., and
STEPHENS, INC.,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 1316

OPINION AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS

THIS MATTER is before the Court on the following motions: (1) Motion to

Dismiss of Defendants Roy J. Moore and Pierce J. Roberts Pursuant to Rules 12(b)(1),

12(b)(2), and 12(b)(6) ("Moore and Roberts Motion"); (2) Motion to Dismiss of

Defendants Christopher Baker, David G. Brown, and Frank McCamant Pursuant to

Rules 12(b)(1), 12(b)(2), and 12(b)(6) ("Baker, Brown, and McCamant Motion"); (3)

Defendant Michael Adams's Motion to Dismiss Pursuant to Rules 12(b)(1) and

12(b)(6) ("Adams Motion"); (4) Defendant James Kerr's Motion to Dismiss Pursuant

to Rules 12(b)(1), 12(b)(2), and 12(b)(6) ("Kerr Motion"); (5) Defendant Neil Kellen's Motion to Dismiss Pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6) ("Kellen Motion"); (6) Motion to Dismiss of Defendants Joseph Mowery and Stephens, Inc. Pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6) ("Mowery and Stephens Motion"); and (7) Defendant Alamo Acquisition Corp.'s Motion to Dismiss Pursuant to Rules 12(b)(2) and 12(b)(6) ("Alamo Motion") (collectively, "Motions").

**THE COURT**, having considered the Motions, the affidavit evidence submitted by Defendants, the briefs in support of and in opposition to the Motions, the oral arguments of counsel at the hearing, and other appropriate matters of record, concludes that the Moore and Roberts Motion, the Baker, Brown, and McCamant Motion, the Kerr Motion, the Kellen Motion, the Mowery and Stephens Motion, and the Alamo Motion should be **GRANTED**, and the Adams Motion should be **GRANTED in part** and **DENIED in part** for the reasons set forth below.

> *Nexsen Pruet, PLLC, by R. Daniel Boyce and Thomas J. Ludlam, for Plaintiffs.*
>
> *RuyakCherian LLP, by Arthur T. Farrell, for Plaintiffs.*
>
> *Kilpatrick Townsend & Stockton LLP, by Joel D. Bush, Jason M. Wenker, Elizabeth Winters, Stephen E. Hudson, John Moye, and Adam H. Charnes, for Defendants.*

McGuire, Judge.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

1.    This action arises out of an Agreement and Plan of Merger ("Merger Agreement") executed on January 24, 2013 by Consert, Inc. ("Consert"), Defendant Alamo Acquisition Corp. ("Alamo"), and Defendant Toshiba Corporation ("Toshiba").

(FAC ¶ 2.)[1] Pursuant to the Merger Agreement, Toshiba acquired Consert, and Alamo, a wholly-owned subsidiary of Toshiba, was merged with and into Consert (the "Merger"). The Merger closed on February 5, 2013. (FAC ¶ 2; Aff. Amy Mansfield Exh. 1 [hereinafter Mansfield Aff.].)

A. *The Parties.*

2. Plaintiffs are former shareholders of Consert, a Delaware corporation with its headquarters in San Antonio, Texas. (FAC ¶ 2; Mansfield Aff. Exh. 1.) Before the Merger, Plaintiffs collectively owned 36.5% of Consert's common stock and 18% of all classes of Consert's stock. (FAC ¶¶ 2, 15.)

3. Toshiba is a Japanese corporation and was a party to the Merger Agreement. (FAC ¶ 26.) Defendant Alamo was a Delaware corporation and a wholly-owned subsidiary of Toshiba. (FAC ¶ 27.) Alamo was formed as a vehicle to facilitate the Merger. (FAC ¶ 27.) Toshiba purchased all of the stock in, acquired, and merged Consert into Alamo, after which time Consert became the surviving wholly-owned subsidiary of Toshiba. (FAC ¶ 26.)

4. Defendants Roy J. Moore ("Moore"), Pierce J. Roberts ("Roberts"), David Brown ("Brown"), Michael Adams ("Adams"), Christopher Baker ("Baker"), James Kerr ("Kerr"), Frank McCamant ("McCamant"), and Neil Kellen ("Kellen"), are former officers and/or directors of Consert (collectively, "O&D Defendants"). (FAC ¶¶ 17–24.)

---

[1] Plaintiffs' alleged facts are drawn from the First Amended Complaint filed on January 26, 2016. The First Amended Complaint is referred to herein by the acronym "FAC."

5. Moore was Consert's Chief Development Officer ("CDO") from January 2008 until the Merger.[2] (FAC ¶ 17; Aff. Roy J. Moore ¶ 3 [hereinafter Moore Aff.].) Moore was also a director of Consert. Roberts was Chairman of Consert's Board of Directors ("Board") and Consert's CEO from January 2008 until the Merger in February 2013. (FAC ¶ 16; Aff. Pierce J. Roberts, Jr. ¶ 3 [hereinafter Roberts Aff.].) Roberts and Moore together held approximately 25% of all classes of Consert stock.

6. Brown, Adams, Baker, Kerr, and McCamant were members of the Board at the time of the Merger in February 2013. (FAC ¶ 21; Aff. David G. Brown ¶ 5 [hereinafter Brown Aff.]; Aff. Chris Baker ¶ 6 [hereinafter Baker Aff.]; Aff. James Y. Kerr, II ¶ 5 [hereinafter Kerr Aff.]; Aff. Frank McCamant ¶ 4 [hereinafter McCamant Aff.].)

7. Kellen began working for Consert as a consultant in March 2012. (Aff. Neil Kellen ¶ 3 [hereinafter Kellen Aff.].) From April 2012 until the Merger in February 2013, Kellen served as Consert's Chief Financial Officer ("CFO"). (Kellen Aff. ¶ 3.)

8. Defendant Stephens, Inc. ("Stephens") is the investment bank that represented Consert in the Merger. (FAC ¶ 29.) Defendant Joseph Mowery ("Mowery") is the managing director of Stephens. (FAC ¶ 28.)

B. *The "Scheme."*

9. Plaintiffs allege that:

> Beginning on or about mid to late 2011, as part of the [O&D] Defendants' decision to sell Consert, Defendants Roberts and Moore, acting individually and in concert with other defendants, devised and executed a scheme which included a number of activities and elements which had

---

[2] Moore also claims to have served as Consert's acting Chief Executive Officer ("CEO") from January 2013 to February 2013. (FAC ¶ 17; Moore Aff. ¶ 3.)

the purpose and effect of disenfranchising certain shareholders, including Plaintiffs. Among other things, Defendants orchestrated the timing of, the negotiations related to, the terms and conditions of, and the actual sale of Consert to Toshiba in a manner and under circumstances that maximized the monetary benefits of the sale to themselves and which disregarded, compromised, and ultimately precluded, monetary returns to Plaintiffs on their investments as shareholders in Consert [("Scheme")].

(FAC ¶ 33.)

10. Plaintiffs allege that in furtherance of the Scheme:

a. Roberts and Moore orchestrated the removal of Plaintiff Joseph W. Forbes, Jr. ("Forbes") from his position as Chief Operating Officer and membership on the Board, as well his termination from employment in the fall of 2011. Forbes was a founder of Consert, Consert's largest common shareholder, and was the principal inventor of all but one of Consert's twenty patents. Plaintiffs contend that Defendants removed Forbes in order to conceal the Scheme from Plaintiffs. (FAC ¶ 41.)

b. Roberts and Moore announced at a shareholders meeting on October 26, 2011 that Consert had entered into a significant contract with CPS Energy Corporation ("CPS") ("Consert/CPS Contract"). (FAC ¶ 42.) Plaintiffs allege that, at this meeting, certain O&D Defendants represented to Plaintiffs that the Consert/CPS Contract was a significant milestone in Consert's success, but the Consert/CPS Contract was never consummated and its non-consummation was not disclosed to Plaintiffs prior to the Merger. (FAC ¶ 43.)

c. Plaintiffs allege that around the same time, "Defendants began the process of relocating Consert's [headquarters] from Raleigh, North Carolina to San

Antonio, Texas. (FAC ¶ 44.) Plaintiffs contend that relocation to Texas was completed in the first quarter of 2012. (FAC ¶ 44.) Defendants have provided evidence that the relocation of Consert's offices from Raleigh to San Antonio was completed in August 2011, and that Consert conducted its business activities from Texas thereafter. (Mansfield Aff. Exhs. 2–3; Moore Aff. ¶ 5; Roberts Aff. ¶¶ 5–6.)

d. Roberts and Moore increased their salaries and accrued those salaries on Consert's books in order to receive "preferential payments for themselves" upon consummation of the Merger. (FAC ¶ 44.)

e. Roberts, Moore, and the other O&D Defendants made loans to Consert at exorbitant interest rates. The loans were to be paid back from the proceeds of the Merger. (FAC ¶ 45.)

f. In January 2013, "Defendants contrived and implemented an additional 'bridge loan' to Consert with egregious and usurious terms intended to insure that Defendant Moore would be guaranteed to receive nearly all of the money that he had invested in Consert common and Series A stock, in the form of a preferential payment at the time of sale." (FAC ¶ 46.)

11. Plaintiffs allege that "the O&D Defendants systematically and collusively prevented Consert's shareholders from receiving any information about the lucrative preferences and other payments that the O&D Defendants had orchestrated for themselves." (FAC ¶ 49.)

12. In April 2012, Consert retained Stephens to find a potential buyer of Consert. (FAC ¶ 51; Aff. Joseph S. Mowery ¶ 4 [hereinafter Mowery Aff.].)

13. The Merger of Consert attracted several interested parties. Toshiba, General Electric, and Silver Spring Networks provided Defendants with written proposals outlining the terms on which they would consider purchasing Consert. (FAC ¶ 52.)

14. At a Board meeting on January 23, 2013, Moore proposed that Consert accept Toshiba's terms, and O&D Defendants unanimously approved that Consert limit further Merger negotiations to Toshiba. (FAC ¶ 53.)

15. On January 24, 2013, Consert, Alamo, and Toshiba executed the Merger Agreement. (FAC ¶ 32.) Moore executed the Merger Agreement on behalf of Consert in Texas. (Moore Aff. ¶ 8.) Plaintiffs allege that O&D Defendants chose to sell Consert to Toshiba because it was the only potential purchaser that would agree to O&D Defendants' terms providing for undisclosed lump sum bonuses and preferential payments to certain executives. (FAC ¶ 72.)

C. *The Shareholders Meeting.*

16. On January 25, 2013, the annual shareholders meeting was held at Consert's headquarters in San Antonio, Texas ("Shareholders Meeting"). (FAC ¶ 69.) Consert Shareholders, including Plaintiffs, could attend in person or by phone. (FAC ¶ 69.) Plaintiff Dennis Worley attended the Shareholders Meeting in person. Moore and Kellen attended in person. Plaintiffs allege that Mowery attended the Shareholders Meeting in person, (FAC ¶ 69), but Mowery provided a sworn affidavit

stating that he attended by phone (Mowery Aff. ¶ 16). Moore presided over the Shareholders Meeting. (FAC ¶ 69.)

17. At the Shareholders Meeting, Moore announced that certain Defendants had executed a definite Merger Agreement to sell Consert to Toshiba, and that O&D Defendants had approved the Merger Agreement. (FAC ¶ 70.) This was the first notice Plaintiffs had received of the Merger of Consert. (FAC ¶¶ 63, 70.) The executed Merger Agreement was not provided to the shareholders at the Shareholders Meeting. (FAC ¶ 70.)

18. Plaintiffs allege that at the Shareholders Meeting,

> Defendants withheld critical information and made material misrepresentations of fact, refused to respond to or answer [the] shareholders' written and oral questions, induced [the] shareholders to approve the Merger Agreement, and expressed the position that Plaintiffs' approval of the sale was irrelevant since Defendants "already had sufficient votes" to push the sale through and close it immediately.

(FAC ¶ 71.)

19. Plaintiffs allege that at the Shareholders Meeting, Moore made the following misrepresentations that were designed to induce the shareholders to consent to the Merger:

a. "Moore represented that although common shareholders would not receive any of the cash proceeds from the sale, that they would receive substantial cash proceeds from the 'earn out' provisions of the Merger Agreement, which he fraudulently characterized as 'most likely to occur' and 'absolutely achievable.'" (FAC ¶ 73.)

b. Moore "coerced Plaintiffs" to "consent to the sale without sufficient information, review, and consideration of their rights." (FAC ¶ 74.)

c. "Moore stated that ' . . . personally, from my personal investment, . . . the bulk of our investment is in the common. I can assure you that I care about the common shareholders[,]'" and that Moore did not disclose that he would receive a significant return on his investment through preference payments at the time of Merger. (FAC ¶ 75.)

d. Moore stated that "'[w]e signed yesterday, we will close and fund and send checks out on the 31st' and 'the reality is we . . . have enough votes to pass this transaction and make it happen', [sic] and 'we believe that [the deal] is in the best interest of all shareholders.'" (FAC ¶ 74.)

20. Plaintiffs also allege that Mowery made material misrepresentations at the Shareholders Meeting designed to induce the shareholders to consent to the Merger: "Mowery stated that 'at the end of the day, the combination of the upfront cash and earn out opportunity . . . that we were able to agree to is clearly the superior opportunity to maximize the shareholder return opportunity.'" (FAC ¶ 72.)

21. Finally, Plaintiffs allege that Defendants' counsel attended the Shareholders Meeting, but at Defendants' direction, refused to respond to Plaintiffs' substantive questions. (FAC ¶ 76.) Plaintiffs allege that Defendants had a fiduciary duty to so respond and their refusal to respond was a part of their Scheme. (FAC ¶ 76.)

D.   *Shareholder Consent Documents.*

22.    On January 28, 2013, three days after the Shareholders Meeting, Consert sent shareholders, including Plaintiffs, a Merger Information Statement ("MIS") and shareholder consent documents (collectively, "Consent Documents"). (FAC ¶ 77.) Plaintiffs allege that the MIS made fraudulent representations, specifically that "[the Board] has carefully considered whether the Merger would be in the respective best interests of Consert and the Stockholders and have concluded that it is." (FAC ¶ 78.) The Consent Documents required that Plaintiffs sign the documents as a condition of receiving any future proceeds from the earn-out provisions in the Merger Agreement, and Plaintiffs were required to return the Consent Documents before January 31, 2013. (FAC ¶¶ 77, 79.) Each Plaintiff signed and returned the Consent Documents. (FAC ¶ 79.)

23.    Plaintiffs allege that, between the Shareholders Meeting and the closing of the Merger, Mowery made phone calls to Plaintiffs and other shareholders, on behalf of himself and Stephens, encouraging them to approve the Merger Agreement and "misrepresenting that the Merger Agreement was a 'good deal for all shareholders' and in the 'best interests of all.'" (FAC ¶ 80.)

24.    The Merger closed on February 5, 2013 in the North Carolina offices of Defendants' counsel. (FAC ¶ 81.) Plaintiffs allege that:

> Of the $30 million in cash merger consideration paid by Defendant Toshiba at closing, approximately $2.2 million was paid to the O&D Defendants and other Consert executives in the form of "change of control" and bonus payments. An additional $2 million was paid to the company's advisors, including its attorneys, and Defendants Stephens Bank and Mowery. An additional $14 million was used to repay

company obligations and loans, including substantial amounts to Defendants Roberts and Moore and to certain strategic investors who were represented on the Board of Directors by other O&D Defendants, at usurious interest rates for "bridge loans" made by them to Consert. The remaining approximately $9.8 million was paid to holders of Consert Series A and Series B Preferred stock, including substantial amounts to O&D Defendants and the companies they represented on the Board of Directors. Plaintiffs did not receive a penny in exchange for their shares of common stock and will not receive anything in the future due to the sham earn out provisions of the Merger Agreement.

(FAC ¶ 81.)

E.     *The Terms of the Merger Agreement.*

25.     The Merger Agreement contained earn-out provisions by which the common shareholders were to receive cash proceeds from two post-merger events ("Earn-Outs"). (FAC ¶ 82.) The proceeds from two post-merger events would generate payments into an independent entity ("Shareholders Fund"), and the Shareholders Fund would distribute the earned funds to Plaintiffs and other shareholders. (FAC ¶ 82.)

26.     One of the post-merger events was the performance of a contract between Toshiba and CPS that was to be executed post-merger for the installation of hardware and software using Consert technology ("Toshiba/CPS Contract"). (FAC ¶ 83.) The Shareholders Fund was to receive twenty-five dollars for each meter and/or instance of monitoring software installed under the Toshiba/CPS Contract over a five-year period, with the total amount received by the Shareholders Fund not to exceed $25 million. (FAC ¶ 84.)

27.     The other post-merger event was the resolution of a lawsuit that had been filed by Consert against Itron, Inc. ("Itron"). (FAC ¶ 85.) Based on a formula, the

Shareholders Fund was to receive a substantial portion of any recoveries received by Consert pursuant to a settlement with Itron or entry of judgment. (FAC ¶ 85.) As described in the Merger Agreement, the Earn-Outs had a total value of between $60 and $70 million. (FAC ¶ 86.)

28. The Earn-Outs, however, were contingent on a "trigger." The trigger was a requirement that (a) the Toshiba/CPS Contract had to be for the purchase of hardware, software, and/or services with a minimum aggregate value of at least $100 million, and (b) the Toshiba/CPS Contract had to be fully executed within one year of the closing of the Merger. (FAC ¶¶ 87–88.) Plaintiffs allege that the Earn-Outs were "illusory and a sham" because "all Defendants knew, at the time the Merger Agreement was executed and approved by the Board and at the time of the [Shareholders Meeting]," that the trigger "would never occur." (FAC ¶ 87.)[3]

29. Plaintiffs allege that Toshiba and CPS subsequently entered into an agreement for less than $100 million, thereby failing to trigger the Earn-Outs. (FAC ¶ 94.) As a result, Plaintiffs allege that they have not and will not receive any proceeds from the Earn-Outs. (FAC ¶ 98.)

30. Plaintiffs allege that Toshiba has made over 400,000 installations under the Toshiba/CPS Contract, and the Itron lawsuit settled in February 2015, from which Consert received approximately $60 million. Plaintiffs allege that these two events,

---

[3] Plaintiffs seem to contradict the assertion that Defendants knew the trigger "would never occur" by also alleging that Defendants knew only that "both earn out provisions were . . . unlikely to occur." (FAC ¶ 90.)

absent the trigger provision, would have resulted in at least $45 million being paid out to Plaintiffs and other shareholders under the Earn-Outs. (FAC ¶¶ 95–96.)

F. *The Lawsuit.*

31. Plaintiffs filed their Complaint on November 9, 2015. On November 16, 2015, this case was designated a mandatory complex business case by order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of Chief Judge James L. Gale on November 18, 2015.

32. Plaintiffs filed the First Amended Complaint ("FAC") on January 26, 2016. The FAC asserts claims for breach of fiduciary duty; common law fraud; constructive fraud; conspiracy to defraud; fraudulent inducement; violation of the North Carolina Securities Act; unlawful taking, conversion, and unjust enrichment; and violation of the North Carolina Unfair and Deceptive Trade Practices Act. (FAC 27–34.)

33. On February 3, 2016, Moore, Roberts, Brown, Baker, Kerr, McCamant, Kellen, Mowery, Stephens, and Alamo filed their motions to dismiss. On February 8, 2016, Adams filed his motion to dismiss. On February 29 and March 1, 2016, Plaintiffs filed their responses in opposition to the Motions, and the Moving Defendants subsequently replied.

34. On February 11, 2016, Plaintiffs filed their Motion to Disqualify Certain Defendants' Counsel ("Motion to Disqualify") seeking to disqualify Joel Bush and the law firm of Kilpatrick Townsend & Stockton, LLC from representing the Moving

Defendants in this case. On March 7, 2016, Moving Defendants filed their response in opposition to the Motion to Disqualify, and Plaintiffs subsequently replied.

35. On March 24, 2016, the Court issued a Notice of Hearing, setting the Motions and the Motion to Disqualify for hearing on April 6, 2016. The Court heard arguments of counsel on that date.[4] At the hearing, the Court informed counsel that regardless of the Court's decision on the Motion to Disqualify, the Court would consider and make a determination on the Motions as briefed and argued by then-current counsel.

36. On May 13, 2016, the Court entered its Order on Motion to Disqualify Counsel, granting the Motion to Disqualify.

37. On May 31, 2016, all named defendants in this action ("Defendants") filed a Notice of Appeal to the Supreme Court of North Carolina of the Court's Order on Motion to Disqualify Counsel ("Appeal").

38. On June 1, 2016, Defendants filed a motion to stay the trial court proceedings pending the Appeal, except with respect to the Court's consideration of the Motions. Defendants, however, indicated they did not oppose an exception to any stay "insofar as the Court still intends to rule on the pending motions to dismiss during the pendency of the appeal," as indicated at the hearing on April 6, 2016. (Defs.' Br. Supp. Mot. Stay 4.)

---

[4] The Court notes that Toshiba filed its motion to dismiss on March 24, 2016, and Defendant Gini Coyle filed her motion to dismiss on April 13, 2016. Those motions were not heard at the April 6, 2016 hearing and thus the Court does not consider them at this time.

39.     On July 14, 2016, the Court entered a Stay Order granting Defendants' motion to stay pending resolution of the Appeal. In its order, the Court noted that Defendants did not oppose the Court ruling on the Motions. (Order Mot. Disqualify 2 n.2.)

## II.     ANALYSIS

40.     Movants move for dismissal on three grounds: (1) pursuant to Rule 12(b)(2) because the Court lacks personal jurisdiction over certain Defendants, (2) pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, and (3) pursuant to Rule 12(b)(6) for failure to state claims for which relief can be granted.

41.     The Court will first address the motions to dismiss for lack of personal jurisdiction. If the Court does not have personal jurisdiction over a Defendant, then that Defendant must be dismissed.

A.     *Motions to Dismiss for Lack of Personal Jurisdiction.*

42.     "[T]he plaintiff bears the burden of proving, by a preponderance of the evidence, grounds for exercising personal jurisdiction over a defendant. . . . [U]pon a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of making out a *prima facie* case that jurisdiction exists." *Bauer v. Douglas Aquatics, Inc.*, 207 N.C. App. 65, 68, 698 S.E.2d 757, 761 (2010) (citation omitted). When a defendant supports his motion to dismiss for lack of personal jurisdiction with affidavits, the plaintiff cannot rest on the unverified allegations in the complaint; rather, the plaintiff must respond by affidavit or otherwise, setting forth specific facts showing that the court has personal jurisdiction. *Id.* at 68–69, 698 S.E.2d at 761; *Banc*

*of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 693, 611 S.E.2d 179, 182 (2005); *Weisman v. Blue Mountain Organics Distribution, LLC*, 2014 NCBC LEXIS 41, at *2 (N.C. Super. Ct. Sept. 5, 2014). "An unverified complaint is not an affidavit or other evidence." *Hill v. Hill*, 11 N.C. App. 1, 10, 180 S.E.2d 424, 430 (1971). When a defendant supports his motion with affidavits and the plaintiff does not offer opposing evidence, the court considers the uncontroverted allegations in the complaint and all facts in the defendant's affidavits in determining whether the court has personal jurisdiction. *Banc of Am. Sec. LLC*, 169 N.C. App. at 693–94, 611 S.E.2d at 182–83; *see also Weisman*, 2014 NCBC LEXIS 41, at *2 (noting that "allegations in a complaint uncontroverted by an affidavit are still taken as true").

43. To determine whether personal jurisdiction over a defendant exists, the Court conducts a two-step analysis: first, personal jurisdiction must exist under the North Carolina long-arm statute; second, the exercise of personal jurisdiction must not violate the due process clause of the Fourteenth Amendment of the United States Constitution. *Bauer*, 207 N.C. App. at 67, 698 S.E.2d at 760; *Banc of Am. Sec. LLC*, 169 N.C. App. at 693, 611 S.E.2d at 182. However, because North Carolina's long-arm statute has been interpreted to allow the exercise of personal jurisdiction to the fullest extent allowed under the due process clause, the two-step analysis collapses into one inquiry. *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 676, 231 S.E.2d 629, 630–31 (1977); *Brown v. Refuel Am., Inc.*, 186 N.C. App. 631, 633, 652 S.E.2d 389, 391 (2007).[5]

---

[5] Plaintiffs contend that the long-arm statute provides a basis for personal jurisdiction over Defendants pursuant to G.S. §§ 1-75.4(1)(d), 1-75.4(3), 1-75.4(5)(c), and 1-75.4(6)(b) and (c).

44.     For a court to exercise personal jurisdiction over a non-resident defendant, due process requires that the defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations omitted). The defendant must purposefully avail himself of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of the forum state's laws. *Tom Togs, Inc. v. Ben Elias Indus. Corp.*, 318 N.C. 361, 365, 348 S.E.2d 782, 786 (1986). The "relationship between the defendant and the forum must be 'such that he should reasonably anticipate being haled into court there.'" *Id.* at 365–66, 348 S.E.2d at 786 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Unilateral activity within the forum state by others who have some relationship with a non-resident defendant is insufficient. *Banc of Am. Sec. LLC*, 169 N.C. App. at 695, 611 S.E.2d at 184. "Each defendant's contacts with the forum State must be assessed individually." *Brown*, 186 N.C. App. at 638, 652 S.E.2d at 394 (quoting *Calder v. Jones*, 465 U.S. 783, 790 (1984)).

45.     In determining whether a defendant has sufficient minimum contacts, North Carolina courts consider "(1) the quantity of the contacts, (2) the nature and quality of the contacts, (3) the source and connection of the cause of action to the contacts, (4) the interest of the forum state, and (5) the convenience to the parties." *Banc of Am. Sec. LLC*, 169 N.C. App. at 696, 611 S.E.2d at 184.

---

For purposes of determining the existence of personal jurisdiction over the PJ Movants, the Court will assume that one or more of the provisions of the long-arm statute applies.

46. There are two types of personal jurisdiction: specific jurisdiction and general jurisdiction. *Id.* Specific jurisdiction exists when a defendant purposefully directed his activities toward the forum and the cause of action arises out of or relates to such activities. *Stetser v. TAP Pharm. Prods. Inc.*, 162 N.C. App. 518, 521, 591 S.E.2d 572, 575 (2004). The essential foundation of specific jurisdiction is the relationship among the defendant, the forum state, and the cause of action. *Tom Togs, Inc.*, 318 N.C. at 366, 348 S.E.2d at 786. The cause of action must arise out of activities defendant purposefully directed toward the forum state. *Stetser*, 162 N.C. App. at 521, 591 S.E.2d at 575. A defendant can reasonably anticipate that he may be sued in a state for injuries arising from activities that he purposefully directed toward that state. *Tom Togs, Inc.*, 318 N.C. at 366, 348 S.E.2d at 786.

47. General jurisdiction exists when the defendant has continuous and systematic contacts with the forum state, even though those contacts may be unrelated to the cause of action. *Stetser*, 162 N.C. App. at 521, 591 S.E.2d at 575. In assessing whether a non-resident defendant has continuous and systematic contacts so as to support general jurisdiction, a court examines all contacts with the forum that occurred during the relevant time period. *Sea-Roy Corp. v. Parts R Parts, Inc.*, 1:94CV00059, 1995 U.S. Dist. LEXIS 21859, at *34–35 (M.D.N.C. Aug. 16, 1995). The level of minimum contacts required to support general jurisdiction is significantly higher than that required to support specific jurisdiction. *Cambridge Homes of N.C. L.P. v. Hyundai Constr., Inc.*, 194 N.C. App. 407, 412, 670 S.E.2d 290, 295 (2008); *Stetser*, 162 N.C. App. at 521, 591 S.E.2d at 575. A determination of whether a

defendant has such continuous and systematic contacts so as to support general jurisdiction is based on the totality of the circumstances and depends on the facts of each case. *Stetser*, 162 N.C. App. at 522–23, 591 S.E.2d at 576.

48. Moore, Roberts, Brown, Baker, Kerr, McCamant, Kellen, Mowery, Stephens, and Alamo (collectively, "PJ Movants") have moved to dismiss Plaintiffs' claims pursuant to Rule 12(b)(2) on the grounds that the Court lacks personal jurisdiction over them, and have filed sworn affidavits in support of their motions. Plaintiffs did not respond by affidavit or otherwise offer evidence in opposition to Defendants' affidavits. PJ Movants contend that the unrebutted facts in the affidavits and the uncontroverted allegations of the FAC establish that the Court lacks personal jurisdiction over each of them because (a) they were not residents of North Carolina at the time this lawsuit was filed, (b) they did not have continuous and systematic contacts with North Carolina that would subject them to general personal jurisdiction, and (c) they did not purposefully direct conduct towards North Carolina out of which the claims in this lawsuit arose.

49. Plaintiffs rely exclusively on the allegations in the FAC in support of their position that the Court has personal jurisdiction over Defendants. In the FAC, Plaintiffs allege, in relevant part, as follows:

> Personal jurisdiction exists over each of the Defendants in this case under the laws of North Carolina. Defendants Coyle, Kerr and Adams are residents of the State of North Carolina. Defendant Stephens Bank has a place of business and does significant business in the State of North Carolina. Consert, of which Defendants Roberts and Moore were officers and directors, and Defendants Adams, Baker, McCamant, Kellen, Kerr and Brown were directors, was headquartered and operated substantially all of its business from North Carolina from its

inception in 2007 until early 2012 when the headquarters were moved to San Antonio, Texas. During the period 2007 through early 2012, Defendants Roberts and Moore, operated and managed the company from Consert's North Carolina Headquarters. The activities complained of either took place in North Carolina or directly affected the financial and other interests of shareholder Plaintiffs who reside in North Carolina. . . . Defendants Stephens Bank and Mowery had significant contacts with Plaintiffs who reside in North Carolina and engaged in activities within North Carolina in an attempt to induce them to approve the sale of Consert. All of the Defendants have sufficient contacts with the State of North Carolina to provide this Court's personal jurisdiction over each of them.

(FAC ¶ 30.)[6]

50. Plaintiffs contend that the Court should not consider whether each individual PJ Movant engaged in conduct or activities that subject the party to personal jurisdiction in North Carolina, but instead should consider the conduct of Defendants collectively. More particularly, Plaintiffs contend that:

a. "[F]rom 2007 through 2011," while Consert was headquartered in Raleigh, Moore, Roberts, Brown, McCamant, Adams, and Kerr "developed a collusive scheme to defraud Plaintiffs" that included taking steps to oust Forbes from Consert. (Pls.' Omnibus Opp'n to Certain Defs.' Mots. Dismiss Counts I-V & on Basis of Lack of Personal Jurisdiction 14 [hereinafter "Pls.' Omnibus Opp'n Mots. Dismiss on PJ"].) Plaintiffs contend this conduct constituted "continuous and systematic" contacts

_____

[6] The Court notes that PJ Movants have provided evidence that Consert's relocation was completed in August 2011 and Consert operated its business from Texas after that time. Plaintiffs have not come forward with any opposing evidence, and therefore, for purposes of its personal jurisdiction analysis, the Court finds that Consert completed its relocation to Texas in August 2011 and operated its business from Texas thereafter.

with North Carolina that confer general personal jurisdiction over the PJ Movants (*Id.*);

b. "After Consert moved from North Carolina, O&D Defendants . . . engaged in additional acts directed at NC Resident Plaintiffs . . . to deprive NC Resident Plaintiffs of the value of their ownership of shares in Consert by: (1) creating a series of loans with usurious interest rates and preference terms, (ii) [sic] increasing their salaries which were accrued as debt on Consert's books, and (iii) [sic] unreasonably delaying the 2012 shareholder's meeting to conceal their activities" (*Id.* 15); and

c. Moore, Mowery and "the O&D Defendants" communicated fraudulent statements to "NC Resident Plaintiffs" and engaged in other acts and omissions that "induced" them "to consent to the merger and forfeit their shareholdings in Consert" (*Id.* 16–18). Plaintiffs argue that "[b]y inference, all such actions were approved by, communicated by, . . . or made on behalf of the Moving Defendants." (*Id.* 16.)

51. The Court will first address Plaintiffs' arguments that the activities of Defendants should be considered collectively, or the activities or conduct of one Defendant attributed to another, for purposes of establishing personal jurisdiction, before considering the facts regarding each of the PJ Movants individually.

52. First, to the extent Plaintiffs contend that the Court has personal jurisdiction over O&D Defendants merely because they were directors and/or officers

of Consert, which was headquartered in North Carolina until August 2011, that contention fails. It is well-established that "[t]o base personal jurisdiction on the bare fact of a defendant's status as, *e.g.*, corporate officer or agent, would violate his due process rights." *Saft Am., Inc. v. Plainview Batteries, Inc.*, 189 N.C. App. 579, 595, 659 S.E.2d 39, 49 (2008) (Arrowood, J., dissenting), *adopted by* 363 N.C. 5, 673 S.E.2d 864 (2009) (per curiam); *Lulla v. Effective Minds, LLC*, 184 N.C. App. 274, 280, 646 S.E.2d 129, 134 (2007); *Robbins v. Ingham*, 179 N.C. App. 764, 771, 635 S.E.2d 610, 615 (2006). "[P]ersonal jurisdiction over an individual officer or employee of a corporation may not be predicated merely upon the corporate contacts with the forum." *Robbins*, 179 N.C. App. at 771, 635 S.E.2d at 615. For a court to assert personal jurisdiction over a corporate agent, he must have committed some affirmative act in his individual, official capacity. *Lulla*, 184 N.C. App. at 280, 646 S.E.2d at 134; *Robbins*, 179 N.C. App. at 769, 635 S.E.2d at 614.

53. In their brief, Plaintiffs appear to argue that (a) the acts of individual Defendants may be imputed to other Defendants for purposes of establishing personal jurisdiction, or (b) that this Court should recognize a "conspiracy" theory of personal jurisdiction. (Pls.' Omnibus Opp'n Mots. Dismiss on PJ 13–18.) Under a conspiracy theory of jurisdiction, a court may have personal jurisdiction over a conspirator who has few contacts with the forum "if substantial acts in furtherance of the conspiracy were performed in the state and the conspirator knew or should have known that these acts would be performed." *Stetser*, 162 N.C. App. at 521, 591 S.E.2d at 575 (quoting *Hanes Cos. v. Ronson*, 712 F. Supp. 1223, 1229 (M.D.N.C. 1988)). North Carolina,

however, has not adopted a conspiracy theory of personal jurisdiction. *Id.*; *Weisman*, 2014 NCBC LEXIS 41, at \*18. The acts of one alleged conspirator-defendant cannot be imputed to his alleged co-conspirator defendants to establish sufficient minimum contacts of the latter.

54. The Court also rejects Plaintiffs' argument that the statements, acts, or omissions of one individual Defendant may be imputed to the other individual Defendants to establish minimum contacts. While a corporate officer or director may be considered an agent of the corporation, there is no basis for concluding that any of the O&D Defendants were acting as agents for one another so as to impute actions and statements by one to another for purposes of establishing sufficient minimum contacts of the latter. *See Godwin v. Walls*, 118 N.C. App. 341, 348, 455 S.E.2d 473, 479 (1995) ("While a corporate entity is liable for any wrongful act or omission of an agent acting with proper authority, it does not follow an agent may be held liable under the jurisdiction of our courts for acts or omissions allegedly committed by the corporation. . . . A corporation can only act through its agents; therefore, plaintiffs may not assert jurisdiction over a corporate agent without some affirmative act committed in his individual official capacity." (citation omitted)); *Robbins*, 179 N.C. App. at 771, 635 S.E.2d at 615–16 (rejecting plaintiffs' argument that acts of corporate agents should be imputed to another corporate agent for purposes of establishing sufficient minimum contacts because the former's acts benefitted the latter as a director and shareholder).

55. Therefore, in assessing whether Plaintiffs have met their burden to establish grounds to support the exercise of personal jurisdiction over each Defendant, the Court will not impute the actions and statements of one defendant to the other individual Defendants, nor will the Court consider the non-individualized, sweeping allegations regarding Defendants' and O&D Defendants' activities; rather, the Court will address below only those allegations pertaining to, and contacts of, the particular Defendant at issue.

1. <u>Plaintiffs have not established by a preponderance of the evidence that the Court has personal jurisdiction over Kellen</u>.

56. Plaintiffs do not specify whether they contend the Court has general or specific personal jurisdiction over Kellen. Kellen has resided in Texas for over ten years. (Kellen Aff. ¶ 2.) Kellen has never resided in North Carolina, owned property in North Carolina, paid income taxes in North Carolina, or had a bank account in North Carolina. (Kellen Aff. ¶¶ 6–9.) Kellen has not traveled to North Carolina in at least twenty years. (Kellen Aff. ¶ 10.) Kellen began working for Consert as a consultant in March 2012, after Consert relocated its offices to Texas, and served as Consert's CFO from April 2012 until the Merger in February 2013. (Kellen Aff. ¶ 3.) Kellen did not travel to North Carolina in connection with the Merger. (Kellen Aff. ¶ 5.)

57. The Complaint does not allege any specific act, statement, or omission by Kellen, except that he attended the Shareholders Meeting. (FAC ¶ 69.) There is no allegation or evidence that any communications or interactions took place between Kellen and Plaintiffs at the Shareholders Meeting or at any other time. Kellen's mere

attendance at the Shareholders Meeting in Texas was not activity purposefully directed at North Carolina.

58. The Court concludes that Kellen does not have sufficient minimum contacts with North Carolina to satisfy due process, and he must be dismissed for lack of personal jurisdiction. The Kellen Motion to dismiss Kellen for lack of personal jurisdiction should be GRANTED.

2. **Plaintiffs have not established by a preponderance of the evidence that the Court has personal jurisdiction over Baker.**

59. Plaintiffs did not make any arguments in support of the Court's exercise of personal jurisdiction over Baker and do not specify whether they contend the Court has general of specific personal jurisdiction over Baker. Baker resides in Georgia and has resided there for over ten years; he has not resided in North Carolina in the last twenty years. (Baker Aff. ¶¶ 2, 8.) Baker has never owned property in North Carolina or had a bank account in North Carolina. (Baker Aff. ¶¶ 9–10.) Baker was a director of Consert from April 2012 until the Merger in February 2013. (Baker Aff. ¶ 6.) Baker attended Board meetings in person in Texas or by phone from Georgia. (Baker Aff. ¶ 7.) Baker did not travel to North Carolina in connection with his role as a director. (Baker Aff. ¶ 7.)

60. The Complaint does not allege any specific act, statement, or omission by Baker in furtherance of the Scheme. Plaintiffs do not allege that Baker attended the Shareholders Meeting.

61. The Court concludes that Baker does not have sufficient minimum contacts with North Carolina to satisfy due process, and he must be dismissed for lack of

personal jurisdiction. The Baker, Brown, and McCamant Motion to dismiss Baker for lack of personal jurisdiction should be GRANTED.

3. **Plaintiffs have not established by a preponderance of the evidence that the Court has personal jurisdiction over McCamant**.

62. Plaintiffs did not make any arguments in support of the Court's exercise of personal jurisdiction over McCamant and do not specify whether they contend the Court has general or specific personal jurisdiction over McCamant. McCamant resides in Texas and has resided there for over fifty-five years; he has never resided in North Carolina. (McCamant Aff. ¶¶ 2, 6.) McCamant has never owned property in North Carolina or had a bank account in North Carolina. (McCamant Aff. ¶¶ 7, 9.) McCamant was a director of Consert from October 2011 until the Merger in February 2013. (McCamant Aff. ¶ 4.) McCamant attended Board meetings in person in Texas. (McCamant Aff. ¶ 5.) McCamant did not travel to North Carolina in connection with his role as a director. (McCamant Aff. ¶ 5.)

63. The Complaint does not allege any specific act, statement, or omission by McCamant in furtherance of the Scheme. Plaintiffs do not allege that McCamant attended the Shareholders Meeting.

64. The Court concludes that McCamant does not have sufficient minimum contacts with North Carolina to satisfy due process, and he must be dismissed for lack of personal jurisdiction. The Baker, Brown, and McCamant Motion to dismiss McCamant for lack of personal jurisdiction should be GRANTED.

### 4. Plaintiffs have not established by a preponderance of the evidence that the Court has personal jurisdiction over Kerr.

65.     Plaintiffs allege that the Court has personal jurisdiction over Kerr because he resides in North Carolina. (FAC ¶ 30.) Kerr, however, filed with the Court a sworn affidavit stating that he has resided in Georgia since March 2014. (Kerr Aff. ¶ 2.) Kerr concedes that he resided in North Carolina from 2008 until 2014. (Br. in Supp. Mot. Dismiss of Def. Kerr 23.) For purposes of its personal jurisdiction analysis, the Court finds that Kerr resided in North Carolina from 2008 until he moved to Georgia in March 2014. The Court also finds that the paradigm forum for Kerr is Georgia since he is domiciled there, and was domiciled in Georgia when this lawsuit was filed. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile . . . .").

66.     Kerr was a director of Consert from 2009 until the Merger in February 2013. (Kerr Aff. ¶¶ 4–5.) Plaintiffs do not allege any specific act, statement, or omission by Kerr in furtherance of the Scheme. There are no allegations regarding Kerr's involvement with Consert during his time as a director or his role in the Merger. Plaintiffs have failed to establish that Kerr had purposeful contacts with North Carolina from which this action arose or to which this action relates so as to justify the exercise of specific jurisdiction. Accordingly, the Court must examine whether Kerr had sufficient contacts with North Carolina to support the exercise of general personal jurisdiction.

67. There are few cases that address the time period during which a defendant must have continuous and systematic contacts with the forum state, but the cases that have addressed the issue have concluded that "[t]he relevant time at which to assess whether a defendant's contacts satisfy the continuous and systematic standard is over a period that is reasonable under the circumstances, up to and including the date the suit was filed." *Young v. Hair*, 7:02-cv-212-F1, 2004 U.S. Dist. LEXIS 6551, at *10 (E.D.N.C. Jan. 26, 2004) (internal quotations omitted) (citing *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569–70 (2d Cir. 1996)); *Harlow v. Children's Hosp.*, 432 F.3d 50, 65 (1st Cir. 2005) (same); *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999) (same).

68. The Court must determine the relevant time for assessing Kerr's contacts with North Carolina under the circumstances involved in this lawsuit. Defendants began the process of the Merger in April 2012 when Consert hired Stephens to explore a Merger of Consert. The Merger closed on February 5, 2013. This action was filed on November 9, 2015. Keeping in mind that whether a defendant has continuous and systematic contacts is to be based on the totality of the circumstances, rather than a mechanical formula, the Court finds that the relevant time period for assessing Kerr's contacts with North Carolina is from April 2012 to November 9, 2015.

69. Kerr had continuous and systematic contacts with North Carolina during the relevant period from April 2012 until March 2014 when he lived in the State. Kerr ceased having continuous contacts when he moved to Georgia roughly 19 months before this lawsuit was filed. Plaintiff has not shown that Kerr has had any contacts

with North Carolina after March 2014, and Kerr was a resident of Georgia at the time this action was filed.

70. The Court finds that Kerr's contacts with North Carolina ceased in March 2014, and Kerr did not have any contacts with North Carolina thereafter. Accordingly, Kerr's contacts with North Carolina were not "continuous" throughout the relevant period. While Kerr lived in North Carolina when the Merger was negotiated and closed, Kerr's contacts with North Carolina during the relevant time period did not remain continuous and systematic so as to justify the exercise of general jurisdiction over him. Therefore, Kerr must be dismissed for lack of personal jurisdiction. The Kerr Motion to dismiss Kerr for lack of personal jurisdiction should be GRANTED.

5. <u>**Plaintiffs have not established by a preponderance of the evidence that the Court has personal jurisdiction over Brown**</u>.

71. Plaintiffs did not make any arguments in support of the Court's exercise of personal jurisdiction over Brown, and do not specify whether they contend the Court has general or specific personal jurisdiction over Brown. Brown has resided in Wyoming since January 2015, and before that resided in California for over twenty years. (Brown Aff. ¶¶ 2–3.) Brown never owned property in North Carolina or had a bank account in North Carolina. (Brown Aff. ¶¶ 11–12.) From 2008 to 2014, Brown traveled to North Carolina from time to time to visit his children who were enrolled at Duke University. (Brown Aff. ¶ 7.) In addition, Brown is an investor in a Texas-based limited partnership that owns data centers in North Carolina. (Brown Aff. ¶ 13.) In 2013, Brown's share of the partnership's North Carolina income was $218, and he paid taxes on that amount to the State of North Carolina. (Brown Aff. ¶ 13.)

72.     Brown was a director of Consert from 2008 until the Merger in February 2013. (Brown Aff. ¶ 5.) From 2008 to 2011, Brown attended Board meetings in Raleigh in person or by telephone phone from California. (Brown Aff. ¶ 6.) There are no facts that show Brown had any contacts with North Carolina in connection with his role as a director after Consert relocated to Texas in August 2011.

73.     In the FAC, Plaintiffs do not allege any specific act, statement, or omission by Brown in furtherance of the Scheme. There are no allegations regarding Brown's involvement with Consert during his time as a director or his role in the Merger. Brown did not travel to North Carolina in connection with the Merger. (Brown Aff. ¶ 9.) The Court concludes that Brown had no purposeful contacts with North Carolina from which this action arises or to which this action relates so as to justify the exercise of specific jurisdiction.

74.     The Court also concludes that, based on the totality of the circumstances, Brown's contacts with North Carolina during the relevant time period were not so continuous and systematic so as to satisfy the higher level of minimum contacts required to support the exercise of general jurisdiction. Therefore, Brown must be dismissed for lack of personal jurisdiction. The Baker, Brown, and McCamant Motion to dismiss Brown for lack of personal jurisdiction should be GRANTED.

6. **Plaintiffs have not established by a preponderance of the evidence that the Court has personal jurisdiction over Moore.**

75.     Plaintiffs contend that the Court has general jurisdiction over Moore based on his participation in developing the Scheme and removing Forbes as COO and a director of Consert while Consert was still headquartered in North Carolina in the

"Summer and Fall of 2011." (Pls.' Omnibus Opp'n Mots. Dismiss on PJ 14.) Plaintiffs have not alleged that Moore was ever present in, or traveled to, North Carolina after Consert relocated to Texas in 2011.

76.    Moore, on the other hand, provided evidence that he has resided in Florida since 2000. (Moore Aff. ¶ 2.) Moore is registered to vote in Florida and has a Florida driver's license. (Moore Aff. ¶ 2.) Moore has never resided in North Carolina, owned property in North Carolina, paid income taxes in North Carolina, or had a bank account in North Carolina. (Moore Aff. ¶¶ 9–12.) Moore did not travel to North Carolina in connection with the Merger. (Moore Aff. ¶¶ 6–7.)

77.    The Court finds that Moore's alleged activities in the fall of 2011 related to developing the Scheme and removing Forbes from Consert were not continuous and systematic contacts with North Carolina sufficient to establish general personal jurisdiction over Moore. Thus, the Court does not have general personal jurisdiction over Moore.

78.    Plaintiffs also apparently contend that the Court has personal jurisdiction over Moore because of his role in the Merger, and particularly in securing the shareholders' approval of the Merger.    Plaintiffs allege Moore made misrepresentations to Plaintiffs, including Plaintiffs who lived in North Carolina, during the Shareholders Meeting. (Pls.' Omnibus Opp'n Mots. Dismiss on PJ 16.) Plaintiffs contend that these communications to North Carolina Plaintiffs amounted to purposeful contacts with North Carolina so as to establish sufficient minimum contacts. (*Id.* 16–18.)

79.     Here, there is nothing that connects Moore's statements at the Shareholders Meeting to North Carolina other than the seven shareholder-plaintiffs who resided in North Carolina. The Shareholders Meeting was held in Texas and multiple shareholders from various different locations attended the meeting in person or by phone.[7] Plaintiffs in this case are residents of North Carolina, Tennessee, Illinois, Texas, Florida, and Oklahoma. The statements Moore made at the Shareholders Meeting were not statements directed at North Carolina; rather, they were statements directed to shareholders, including Plaintiffs, seven of whom are residents of North Carolina and five of whom are residents of five other states. To conclude that Moore's statements at the Shareholders Meeting constitute activity purposefully directed at North Carolina would require the corresponding conclusion that such statements also constitute activity purposefully directed at Tennessee, Illinois, Florida, Oklahoma, and any other state in which a shareholder who attended the Shareholders Meeting resided. *See Bank of Am., N.A. v. Corporex Cos., LLC*, 3:13-cv-691-RJC, 2014 U.S. Dist. LEXIS 102670, at *13 (W.D.N.C. July 28, 2014) ("[T]he fact that Defendants directed their actions against a party in North Carolina is not sufficient, standing alone, to confer jurisdiction over the parties where no other facts exist to support such. To rule otherwise would be to risk exercising personal jurisdiction for torts wherever a plaintiff happened to be located because that is where the injury would be felt most strongly.").

---

[7] Plaintiffs have alleged that "the [Shareholders Meeting] was available for shareholders, including Plaintiffs, to attend in person or by telephone," but do not allege that any of the Plaintiffs other than Worley attended the meeting or actually heard Moore's alleged statements. (FAC ¶¶ 69, 76.)

80. Plaintiffs also argue that after Consert moved out of North Carolina, Moore and the other O&D Defendants "engaged in additional acts directed at NC Resident Plaintiffs . . . to deprive NC Resident Plaintiffs of the value of their ownership of shares in Consert" including making usurious loans to Consert, increasing their salaries and accruing the salaries as debt, and delaying the 2012 shareholders meeting. (Pls.' Omnibus Opp'n Mots. Dismiss on PJ 15.) Plaintiffs claim that at the time they took these actions, "O&D Defendants knew that most of Consert's shareholders resided in North Carolina." (*Id.*) Such knowledge, however, does not make Moore's activities purposeful contacts directed at North Carolina. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985) ("Although it has been argued that foreseeability of causing *injury* in another State should be sufficient to establish such contacts there when policy considerations so require, the Court has consistently held that this kind of foreseeability is not a "sufficient benchmark" for exercising personal jurisdiction.").

81. The above activities were not purposefully directed at North Carolina so as to confer personal jurisdiction over Moore in this Court. At the time of all of the above acts, Consert was a Delaware corporation headquartered in Texas. The fact that seven North Carolina plaintiffs contend that they were affected in North Carolina by these activities does not transform Moore's activities into ones purposefully directed at North Carolina. The Supreme Court recently addressed the nature of the contacts required to exercise specific jurisdiction over a non-resident defendant in *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). The Court explained that "however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in

determining whether the defendant's due process rights are violated.' . . . [O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself." *Id.* at 1122. With regard to whether injury to a plaintiff within the forum state was sufficient to establish a defendant's minimum contacts, the Court held:

> *Calder* [*v. Jones*, 465 U.S. 783 (1984)] made clear that mere injury to a forum resident is not a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.

*Id.* at 1125. Moore's conduct connected to the Merger, even if it impacted certain Plaintiffs who live in North Carolina, was not purposefully directed at this State.

82. In light of the foregoing, the Court concludes that Plaintiffs have failed to establish Moore has sufficient minimum contacts with North Carolina to satisfy due process, and he must be dismissed for lack of personal jurisdiction. The Moore and Roberts Motion to dismiss Moore for lack of personal jurisdiction should be GRANTED.

7. <u>**Plaintiffs have not established by a preponderance of the evidence that the Court has personal jurisdiction over Roberts**</u>.

83. Plaintiffs contend that the Court has general jurisdiction over Roberts based on his participation in developing the Scheme and removing Forbes as COO, and as a director of Consert while Consert was still headquartered in North Carolina in the "Summer and Fall of 2011." (Pls.' Omnibus Opp'n Mots. Dismiss on PJ 14.) Roberts did not travel to North Carolina in connection with the Merger. (Roberts Aff. ¶¶ 8–9.) Roberts admits he traveled to North Carolina for one day in January 2012 to close

Consert's Raleigh office. (Roberts Aff. ¶ 7.) Plaintiffs do not allege that Roberts was present in North Carolina at any time after January 2012.

84. Roberts filed an affidavit establishing that he has resided in Florida since 1998. (Roberts Aff. ¶ 2.) Roberts has never resided in North Carolina, paid income taxes in North Carolina, or had a bank account in North Carolina. (Roberts Aff. ¶¶ 11, 13–14.) Roberts also owns approximately two acres of undeveloped land in Burnsville, North Carolina. (Roberts Aff. ¶ 12.)

85. It is clear that Roberts is domiciled in Florida and Florida is the paradigm forum with general jurisdiction over Roberts. The Court finds that Robert's alleged activities in the fall of 2011 related to developing the Scheme and removing Forbes from Consert were not continuous and systematic contacts with North Carolina sufficient to establish general personal jurisdiction over Moore.

86. The Court also finds that Roberts's ownership of a piece of undeveloped land in North Carolina, without more, is insufficient for the Court to conclude that Roberts has purposefully availed himself of the privilege of conducting activities in North Carolina. The nature and quality of the contact created by the ownership of a single piece of undeveloped property are not sufficient to confer general jurisdiction over Roberts. *Banc of Am. Sec. LLC*, 169 N.C. App. at 696, 611 S.E.2d at 184. In addition, there is no connection between the cause of action in this lawsuit and the piece of property. A finding that mere ownership of land subjects a non-resident defendant to jurisdiction with respect to any and all claims asserted against him is contrary to the courts' disfavor of broad constructions of general jurisdiction. *Daimler AG v. Bauman*,

134 S. Ct. 746, 753, 757–58 (2014) (discussing the strict territorial approach to personal jurisdiction taken in *Pennoyer v. Neff*, 95 U.S. 714 (1878) and noting that "[s]pecific jurisdiction has been cut loose from *Pennoyer*'s sway, but [the Court] ha[s] declined to stretch general jurisdiction beyond limits traditionally recognized"). The Court concludes that it does not have general personal jurisdiction over Roberts based on his alleged activities in the fall of 2011 and his ownership of undeveloped land.

87.    With respect to specific jurisdiction, Plaintiffs do not allege Roberts had any contacts with North Carolina from which this action arises or to which this action relates.[8] Based on the record, Roberts's only contact with North Carolina that was related to his role as a director was his one day-trip to Raleigh in January 2012, to close Consert's office, which was unrelated to Plaintiffs' claims in this case. The FAC does not allege any other act, statement, or omission by Roberts.

88.    The Court concludes that Plaintiffs have failed to establish Roberts has sufficient minimum contacts with North Carolina to satisfy due process, and he must be dismissed for lack of personal jurisdiction. The Moore and Roberts Motion to dismiss Roberts for lack of personal jurisdiction should be GRANTED.

8. <u>Plaintiffs have not established by a preponderance of the evidence that the Court has personal jurisdiction over Mowery</u>.

89.    Plaintiffs do not specify whether they contend the Court has general or specific personal jurisdiction over Mowery. Mowery has resided in Arkansas for twenty-five years. (Mowery Aff. ¶ 2.) Mowery has never resided in North Carolina and

---

[8] Plaintiffs allege that Roberts doubled his salary in April 2012, and accrued the increased salary on Consert's books to create preferential payments upon completion of the Merger. (FAC ¶ 44.) This conduct admittedly occurred in Texas. (*Id.*)

does not own property in North Carolina. (Mowery Aff. ¶¶ 18–19.) There is no allegation or evidence that Mowery has ever visited North Carolina.

90.   Mowery is the managing director of Stephens, which is headquartered in Little Rock, Arkansas. (Mowery Aff. ¶ 3.) In April 2012, after Consert had relocated its headquarters to San Antonio, Texas, Consert engaged Stephens to provide investment banking services in connection with attempting to find a buyer for Consert. (Mowery ¶¶ 4–5.) Mowery directly supervised and managed Stephens's engagement with Consert and was Consert's primary contact at Stephens. (Mowery Aff. ¶ 6.) Mowery did not travel to North Carolina in connection with Stephens's engagement with Consert. (Mowery Aff. ¶ 21.) Mowery attended, in person and by phone, meetings held in Texas with representatives of Consert and Toshiba to discuss potential terms of a proposed transaction and the terms of the Merger. (Mowery Aff. ¶¶ 10, 12.) Mowery attended Board meetings conducted in Texas on July 25, 2012, October 24, 2012, November 27, 2012, and January 15, 2013, in person and by phone, to update the Board on the status of the Merger. (Mowery Aff. ¶ 11.)

91.   Mowery attended the Shareholders Meeting. Plaintiffs contend that at the Shareholders Meeting, Mowery made misstatements of fact designed to induce the shareholders to consent to the Merger. For the same reasons Moore's statements during the Shareholders Meeting do not constitute activity purposefully directed at North Carolina, Mowery's statements during the Shareholders Meeting do not constitute such purposefully directed activity for purposes of establishing sufficient minimum contacts.

92.    Plaintiffs also allege that between the Shareholders Meeting and the close of the Merger, Mowery "made calls to Plaintiffs and other shareholders encouraging them to approve the Merger Agreement" and "misrepresenting that the Merger Agreement was a 'good deal for all shareholders' and in the 'best interests of all.'" (FAC ¶ 80.) Plaintiffs, however, do not allege to which Plaintiffs or other shareholders Mowery made phone calls, or whether any of those phone calls were made to residents of North Carolina. In his affidavit, Mowery states that "[o]n or about January 29, 2013, I spoke by telephone with Plaintiff Joseph Forbes about the terms of the Merger. I participated in the call from my office in Little Rock, Arkansas. To the best of my recollection, the call with Mr. Forbes lasted roughly thirty minutes." (Mowery Aff. ¶ 17.) Plaintiffs allege that Forbes is a resident of North Carolina, and for purposes of its personal jurisdiction analysis, the Court will assume Mowery called Forbes while Forbes was in North Carolina. Plaintiff has not established that Mowery made any other phone calls to North Carolina or to North Carolina residents. *Bauer v. Douglas Aquatics, Inc.*, 207 N.C. App. 65, 68, 698 S.E.2d 757, 761 (2010) ("[T]he plaintiff bears the burden of proving, by a preponderance of the evidence, grounds for exercising personal jurisdiction over a defendant.").

93.    Even construing Plaintiffs' allegation in the light most favorable to Plaintiffs, Mowery's phone call to Forbes does not establish sufficient contacts with North Carolina for this Court to exercise personal jurisdiction over Mowery. Generally, personal jurisdiction may not be based solely on an individual's phone calls to a party located in the forum state. *Alacrity Renovation Servs., LLC v. Long*, No.

3:16-cv-00206-FDW-DSC, 2016 U.S. Dist. LEXIS 101735, at *21 (W.D.N.C. Aug. 3, 2016) (phone calls to plaintiff in North Carolina do not constitute sufficient minimum contacts with North Carolina "unless the parties had an extensive, substantive, or continuing relationship that tied their behavior to the forum state"); *Protocol, LLC v. Henderson*, 18 F. Supp. 3d 689, 701 (M.D.N.C. 2014) (noting that communications to a party in the forum state are generally not purposeful contact with the forum state and placing limited weight on the phone calls between defendant and North Carolina plaintiff); *Springs v. Ally Fin., Inc.*, No. 3:10-CV-311-RJC-DCK, 2010 U.S. Dist. LEXIS 123233, at *27–28 (W.D.N.C. Oct. 14, 2010) (stating that phone calls do not provide a basis for personal jurisdiction because they are not tantamount to physical presence); *WLC, LLC*, 454 F. Supp. 2d at 436–37 (referring to defendants' e-mails and phone calls to North Carolina plaintiff and stating "that an exchange of communications between two parties, one of whom is located in the forum state, in furtherance of a contract, will not generally constitute purposeful contact with the forum state for purposes of jurisdiction"); *Miller v. Szilagyi*, 221 N.C. App. 79, 92–93, 726 S.E.2d 873, 883 (2012) ("[P]hone calls, like contracts, do not *automatically* establish the necessary minimum contacts with this State for the establishment of personal jurisdiction. . . . Plaintiff has not demonstrated how the correspondences from the [defendants] to Plaintiff in North Carolina constituted a purposeful availment by the [defendants] of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws." (internal quotations omitted)).

94.     Moreover, Mowery did not purposefully direct his activity at North Carolina. "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State." *Walden*, 134 S. Ct. at 1123. Mowery contacted Plaintiffs because of their status as shareholders of Consert, a Delaware corporation with its principal place of business in Texas. Seven shareholder-plaintiffs happened to be North Carolina residents, but the other five shareholder-plaintiffs are located in five different states. *See Alacrity Renovation Servs., LLC*, 2016 U.S. Dist. LEXIS 101735, at \*22 (concluding communications between defendant and plaintiff in North Carolina are insufficient to establish minimum contacts because such communications are contacts with persons who reside in North Carolina, not contacts with North Carolina itself); *Protocol, LLC*, 18 F. Supp. 3d at 701 (noting that defendant's communications to plaintiff "were directed at North Carolina only because [plaintiff] happened to be located there"); *WLC, LLC*, 454 F. Supp. 2d at 438 ("[I]t appears that the contacts between Defendants and North Carolina arose merely because Plaintiff is located in North Carolina and not because Defendants purposely directed their activities towards the State of North Carolina."); *Sea-Roy Corp.*, 1995 U.S. Dist. LEXIS 21859, at \*32 ("[I]t is necessary to distinguish between a defendant's acts which are aimed at a plaintiff who is located in a forum and those which are aimed at the forum itself: only those acts in the second category constitute purposeful and deliberate contact with the forum which makes it

fair and reasonable for the forum to exercise personal jurisdiction." (internal quotations omitted)).

95. Mowery has never resided in North Carolina and his participation in the Merger took place entirely outside of North Carolina. On similar facts, North Carolina courts have declined to exercise specific jurisdiction over a defendant. *See Curvcraft, Inc. v. J.C.F. & Assocs., Inc.*, 84 N.C. App. 450, 452, 352 S.E.2d 848, 849 (1987) (no specific jurisdiction when defendant resided outside of the state and "never traveled to North Carolina in connection with th[e] contract" that was the focus of the complaint); *see also WLC, LLC*, 454 F. Supp. 2d at 432 (no specific jurisdiction when the vast majority of the work on the consulting agreement at issue had taken place in Mississippi and other states, not North Carolina); *Weisman v. Blue Mt. Organics Distrib., LLC*, 2014 NCBC LEXIS 41, *16 (N.C. Super. Ct. 2014) (declining to exercise specific jurisdiction when all activity related to relevant transaction "occurred entirely in Virginia"); *Cameron-Brown Co. v. Daves*, 83 N.C. App. 281, 285–87, 350 S.E.2d 111, 114–16 (1986) (no specific jurisdiction over defendant when negotiations over contract at issue occurred in South Carolina; defendant was a South Carolina resident; and defendant's only contact with North Carolina was mailing payments to North Carolina office pursuant to the contract).

96. Based on the foregoing, Mowery did not have sufficient minimum contacts with North Carolina to confer personal jurisdiction over him in this Court. The Mowery and Stephens Motion to dismiss Mowery for lack of personal jurisdiction should be GRANTED.

### 9. Plaintiffs have not established by a preponderance of the evidence that the Court has personal jurisdiction over Stephens.

97. Plaintiffs appear to contend that the Court has both specific and general personal jurisdiction over Stephens. Plaintiffs allege that Stephens "is a corporation having its principal place of business in Little Rock, Arkansas and an office at 101 S. Stratford Road, Winston-Salem, North Carolina." (FAC ¶ 29.) Plaintiffs allege that Stephens "had significant contacts with Plaintiffs who reside in North Carolina and engaged in activities within North Carolina in an attempt to induce them to approve the [S]ale[,]" but the only specific activity attributed to Stephens are Mowery's alleged phone calls to unnamed "Plaintiffs and other shareholders." (FAC ¶¶ 30, 80.)

98. Defendants submitted affidavit evidence that Stephens is an Arkansas corporation headquartered in Little Rock. (Mowery Aff. ¶ 3.) During the engagement by Consert, Mowery "supervised a team of investment bankers and analysts within Stephens who were working on the merger transaction." (Mowery Aff. ¶ 13.) All of the Stephens employees who worked on the Merger were based in Little Rock, Arkansas. (*Id.*) No one on Stephens's investment banking team traveled to North Carolina in connection with Stephens's engagement with Consert. (Mowery Aff. ¶ 21.)

99. Stephens has retail branch offices in Winston-Salem and Charlotte, North Carolina, which provide wealth management services. (Mowery Aff. ¶ 14.) Stephens does not employ corporate finance investment bankers who perform the type of services provided during the Consert engagement in North Carolina. (Mowery Aff. ¶ 14.) None of Stephens's North Carolina employees worked on the Merger. (Mowery Aff. ¶¶ 13–14.)

100. Stephens's only contacts with North Carolina related the Merger were Mowery's. The Court already has determined that Mowery did not have sufficient minimum contacts with North Carolina to satisfy due process. Therefore, the Court concludes that Stephens does not have sufficient minimum contacts with North Carolina from which this action arises or to which this action relates to support the exercise of specific jurisdiction.

101. General jurisdiction requires a "significantly higher" level of contacts with the forum state than specific jurisdiction. *Cambridge Homes of N.C. L.P. v. Hyundai Constr., Inc.*, 194 N.C. App. 407, 412, 670 S.E.2d 290, 295 (2008). General jurisdiction over a foreign corporation exists "when [its] affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State." *Daimler AG*, 134 S. Ct. at 754 (internal quotations omitted) (quoting *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919). The paradigm forums for the exercise of general jurisdiction over a corporation are the corporation's place of incorporation and principal place of business. *Id.* at 760. Only in an exceptional case may a corporation's contacts with another state be so continuous and systematic so as to render it essentially at home there. *Id.* at 761 n.19; *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) (stating that "*Daimler* established that, except in a truly exceptional case, a corporate defendant may be treated as essentially at home only where it is incorporated or maintains its principal place of business" and noting that at least three other circuits agree with such interpretation); *Hutton v. Hydra-Tech, Inc.*, 1:14-cv-888, 2016 U.S. Dist. LEXIS 135497, at *10 (M.D.N.C. Sept. 30, 2016);

*Ricks v. Armstrong Int'l, Inc.*, No. 4:14-CV-37-BO, 2014 U.S. Dist. LEXIS 86600, at *6 (E.D.N.C. June 24, 2014).

102. The "textbook case" for exercising general jurisdiction over a foreign corporation is *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952). The defendant in *Perkins* was a Philippine mining company. The company's president ceased mining operations due to World War II and "moved to Ohio, where he kept an office, maintained the company's files, and oversaw the company's activities." *Id.* at 756 (citing *Perkins*, 342 U.S. at 448). The Supreme Court held that Ohio courts had general jurisdiction over defendant "because 'Ohio was the corporation's principal, if temporary, place of business.'" *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780, n.11 (1984)).

103. Here, Stephens is an Arkansas corporation with its principal place of business in Little Rock, Arkansas, and Arkansas is the paradigm forum with general jurisdiction over Stephens. Nevertheless, Plaintiffs appear to contend that the Court has personal jurisdiction over Stephens because it "has a place of business and does significant business in the State of North Carolina." (FAC ¶ 30.) Plaintiffs, however, have not provided evidence, argued, or even alleged that the nature or amount of business Stephens conducts in North Carolina would render Stephens "essentially at home" in this State for purposes of asserting general personal jurisdiction. *Weisman*, 2014 NCBC LEXIS 41, at *12 (evidence that defendant-company "received only 3.6% of its total sales volume from North Carolina" was "insufficient to support general jurisdiction over [it]"); *Occidental Fire & Cas. Co. v. Cont'l Ill. Nat'l Bank & Tr.*

*Co.*, 689 F. Supp. 564, 568 & n.1 (E.D.N.C. 1988) (finding no general jurisdiction existed when the defendant's loan activity in the forum state exceeded $100 million); *Ash v. Burnham Corp.*, 80 N.C. App. 459, 461–62, 343 S.E.2d 2, 3–4 (1986) (holding that the defendant's sales to North Carolina customers, comprising 0.5% of its total annual sales, was insufficient to support jurisdiction).

104. Even considering that Stephens has two retail offices in North Carolina, Plaintiffs have failed to show that Stephens's contacts with North Carolina satisfy the demanding standard for exercising general jurisdiction over a foreign corporation. *See Brown*, 814 F.3d at 628–29 (concluding that defendant's contacts with the forum state did not render it essentially at home there where defendant leased the same building in the state for over fifteen years and ran operations at three other leased locations in the state); *Cutcher v. Midland Funding, LLC*, No. ELH-13-3733, 2014 U.S. Dist. LEXIS 68768, at *21 (D. Md. May 19, 2014) (concluding that plaintiff failed to make a prima facie showing that defendants' contacts with Maryland are so continuous and systematic such that defendants are essentially at home in Maryland where plaintiff merely alleged that defendants maintain a place of business in Maryland and conduct business in Maryland).

105. The Court concludes that Plaintiffs have failed to establish Stephens's contacts with North Carolina are so continuous and systematic that it is essentially at home in North Carolina. The Mowery and Stephens Motion to dismiss Stephens for lack of personal jurisdiction should be GRANTED.

## 9. Plaintiffs have not established by a preponderance of the evidence that the Court has personal jurisdiction over Alamo.

106. Plaintiffs make no specific argument regarding this Court's personal jurisdiction over Alamo. The FAC does not allege that Alamo had any corporate existence beyond acting as a temporary vehicle for completing the Merger, does not allege that Alamo had any employees or agents, and does not allege that Alamo engaged in any specific act, statement, or omission in furtherance of the Scheme.

107. Alamo contends that it "was merged 'with and into' Consert and 'disappeared' as a separate legal entity on February 1, 2013. Given that Alamo no longer has a corporate existence, it must be dismissed pursuant to N.C. R. Civ. P. 12(b)(2)." (Alamo's Br. Supp. Mot. Dismiss 5.) Alamo provided evidence that it was merged with and into Consert, and that Consert was the surviving corporation. (Mansfield Aff. Exh. 1; Pellissier Aff. ¶ 4.) Plaintiffs allege that Consert was merged into Alamo, but concede that Consert was the surviving corporation. (FAC ¶¶ 2, 26.) Plaintiffs, however, have not presented evidence to rebut Alamo's evidence that it no longer has a corporate existence, and Plaintiffs made no specific argument regarding Alamo's current corporate status in its brief opposing the Alamo Motion.

108. Delaware law applies to the question of whether Alamo, a Delaware corporation, continues to have a legal existence. *Bluebird Corp. v. Aubin*, 188 N.C. App. 671, 680, 657 S.E.2d 55, 63 (2008) ("States normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care."); *Akande v. Transamerica Airlines, Inc.*, No. 1039-VCP, 2007 Del. Ch. LEXIS 68, at *63 (Del. Ch. May 25, 2007) ("[T]he existence or

nonexistence of a Delaware corporation is governed by Delaware law."); *Beals v. Wash. Int'l, Inc.*, 386 A.2d 1156, 1161 (Del. Ch. 1978) ("In resolving questions centering on corporate existence . . . , it should be kept in mind that corporations exist only by legislative act.").

109. Under Delaware law, two Delaware corporations may be merged into a single corporation, which may be one of the constituent corporations. Del. Code Ann. tit. 8, § 251(a); *Cigna Health & Life Ins. Co. v. Audax Health Sols., Inc.*, 107 A.3d 1082, 1097 n.57 (Del. Ch. 2014). When two corporations merge, the merged corporation's identity is merged into the surviving corporation and the merged corporation ceases to exist; only the surviving corporation maintains its corporate existence. Del. Code Ann. tit. 8, § 259(a); *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 86 (Del. Ch. 2013) ("[U]nder section 259, the corporation that was merged into the second corporation cease[d] to exist." (internal quotations omitted) (second alteration in original)); *Beals*, 386 A.2d at 1161 ("Since by statute, corporate existence is terminated on the date of merger, a corporation ceases to exist on merger for all purposes . . . ." (citation omitted)); *Argenbright v. Phx. Fin. Co.*, 187 A. 124, 126 (Del. Ch. 1936) ("When a . . . merger has taken place under the statute, the old corporations have their identity absorbed into that of the new corporation or the one into which they were merged.").

110. As a result, when a merger becomes effective upon the filing of the merger agreement or a certificate of merger with the Secretary of State, the merged corporation lacks the capacity to sue or be sued. *Nat'l Union Fire Ins. Co. v. Stauffer*

*Chem. Co.*, C.A. No. 87C-SE-11, 1991 Del. Super. LEXIS 269, at *7–8 (Del. Sup. Ct. July 15, 1991) (dismissing a corporate defendant who had merged into another corporation at the time the action was filed because the merged corporation lacked the capacity to be sued); *see* Del. Code Ann. tit. 8, § 251(c).

111. Here, Alamo was formed in Delaware on January 23, 2013 and merged into Consert pursuant to Del. Code Ann. tit. 8, § 251. (Mansfield Aff. Exh. 1.) A certificate of merger was filed with the Delaware Secretary of State on February 1, 2013. (*Id.*) Once the certificate of merger was filed, Alamo ceased to exist.

112. This action was filed on November 9, 2015, which was after Alamo's existence ended. Alamo lacks the capacity to be sued and must be dismissed. *Rankin v. Food Lion*, 210 N.C. App. 213, 216–17, 706 S.E.2d 310, 313 (2011) (affirming summary judgment where the defendants submitted an affidavit establishing, *inter alia*, that two of the corporate defendants no longer existed and a third was "not a legal entity"); *Deal v. Cape Fear Valley Hosp.*, No. 5:09-CT-3066-D, 2011 U.S. Dist. LEXIS 10375, at *10–11 (E.D.N.C. Feb. 2, 2011) (dismissing claims on Rule 12(b)(2) grounds where defendant's affidavit established that the entity sued by plaintiff did not exist); *Thomas v. Kerr Drug Stores, Inc.*, No. 74-36-CIV-8, 1975 U.S. Dist. LEXIS 16872, at *2 n.1 (E.D.N.C. June 10, 1975) ("Defendant Kerr Wholesale, Inc. . . . no longer exists as a corporate entity, its full functions having been absorbed by Kerr Drugs Stores, Inc. The case must therefore be dismissed as to the former party.").

113. The Court concludes that at the time this lawsuit was filed, Alamo did not have a legal existence as a corporation and could not be sued. The Alamo Motion to dismiss Alamo for lack of personal jurisdiction should be GRANTED.[9]

B.  *Adams Motion.*

114. In the FAC, Plaintiffs make claims against Adams for: (1) breach of fiduciary duty; (2) common law fraud; (3) constructive fraud; (4) conspiracy to defraud; (5) fraudulent inducement; and (6) unfair and deceptive trade practices. (FAC 27–31, 34.) Plaintiffs, however, have not made any specific allegations regarding Adams in the FAC other than the allegations identifying him as a Defendant. (FAC ¶ 21.)

115. Adams is a resident of North Carolina and accordingly has not moved to dismiss for lack of personal jurisdiction. Instead, Adams moves to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, contending that all of Plaintiffs' claims are derivative claims of Consert and Plaintiffs lack standing to bring direct claims against Adams.

116. Alternatively, Adams moves to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

1. <u>**Plaintiffs' claims are not derivative and the Court has subject matter jurisdiction over the claims.**</u>

117. A court shall dismiss the action when it appears that the court lacks subject matter jurisdiction. N.C. Gen. Stat. § 1A-1, Rule 12(h)(3). A defect in subject matter jurisdiction may be raised by a party or by the court *sua sponte. Conner Bros. Mach.*

---

[9] In addition, even if Alamo had the capacity to be sued, Plaintiffs have alleged no facts and provided no evidence that Alamo had contacts with North Carolina that would establish that this Court has personal jurisdiction over Alamo. Dismissal is also mandated on that basis.

*Co. v. Rogers*, 177 N.C. App. 560, 561, 629 S.E.2d 344, 345 (2006). "A motion to dismiss for lack of subject matter jurisdiction is not viewed in the same manner as a motion to dismiss for failure to state a claim upon which relief can be granted." *Tart v. Walker*, 38 N.C. App. 500, 502, 248 S.E.2d 736, 737 (1978). A court may consider matters outside the pleadings in determining whether subject matter jurisdiction exists. *Keith v. Wallerich*, 201 N.C. App. 550, 554, 687 S.E.2d 299, 302 (2009); *Tart*, 38 N.C. App. at 502, 248 S.E.2d at 737.

118. Adams contends that all of Plaintiffs' claims against him are derivative claims belonging to Consert and can only be asserted by or on behalf of Consert. (Br. Supp. Adams's Mot. to Dismiss 6.)

119. Adams concedes that "[g]iven that Consert is a Delaware corporation, the substantive laws and requirements of Delaware regarding derivative claims apply to Plaintiffs' action." (Br. in Supp. Adams's Mot. to Dismiss 6 n.6); *see also Scott v. Lackey*, 2012 NCBC LEXIS 60, at *14 (N.C. Super. Ct. Dec. 3, 2012) ("North Carolina courts look to the laws of the state in which the company is incorporated to determine the procedural prerequisites and whether the claim is derivative or individual." (internal quotations omitted)). Adams incorrectly contends, however, that Plaintiffs' claims are derivative because "both Delaware and North Carolina apply the same standard for derivative claims and their procedural prerequisites." (Br. in Supp. Adams's Mot. to Dismiss 6 n.6.) Based on this erroneous position, Adams contends that in order for Plaintiffs to maintain direct claims against him, they must fit within

the "special duty" or "separate and distinct injury" exceptions under *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 488 S.E.2d 215 (1997).

120. Delaware law is different from North Carolina law and recognizes an individual shareholder's right to bring direct claims against directors and officers under certain circumstances. Under controlling Delaware law, whether a claim is direct or derivative turns on two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

121. Under Delaware law, it is well-settled that "[a] stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been consummated." *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1245 (Del. 1999); *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, C.A. No. 5334-VCN, 2011 Del. Ch. LEXIS 147, at *41 & n.69 (Del. Ch. Sept. 30, 2011) (citing *Parnes*, 722 A.2d at 1245). *Parnes*, a Delaware Supreme Court decision finding that Plaintiffs' allegations constituted an actionable direct claim on similar facts, is instructive. In *Parnes*, a shareholder alleged that the corporation's directors breached their fiduciary duties by entering into a merger that allegedly was the result of unfair dealing and resulted in an unfair price. *Parnes*, 722 A.2d at 1244. The Supreme Court of Delaware reversed the Court of Chancery's dismissal, finding that the alleged unfairness of the merger

terms, a result of alleged self-dealing, was a direct claim. *Id.* at 1246; *see also In re Ply Gem Indus., Inc.,* C.A. No. 15779-NC, 2001 Del. Ch. LEXIS 84, at \*16 (Del. Ch. June 26, 2001) ("The attack on [the CEO]'s conduct during the course of the merger negotiations, and the board's acquiescence in it, is a challenge by Plaintiffs to the fairness of the merger process. Accordingly, *Parnes* dictates that Plaintiffs' claims must be treated as individual claims and not as derivative claims.").

122.    Here, Plaintiffs allege that O&D Defendants engaged in conduct that was designed to ensure that they received benefits from the Merger, but that Plaintiffs did not. Plaintiffs allege that O&D Defendants misrepresented and omitted material facts to Plaintiffs to induce them to agree to the Merger. Plaintiffs allege that O&D Defendants' misconduct resulted in O&D Defendants receiving substantial benefits from the Merger, while Plaintiffs received nothing.

123.    Under *Parnes* and its progeny, the allegations of the FAC are a challenge by Plaintiffs to the fairness of the merger process that render Plaintiffs' claims direct claims, rather than derivative claims. The Adams Motion to dismiss for lack of subject matter jurisdiction should be DENIED.

### 2.    Adams's Rule 12(b)(6) Motions to Dismiss.

124.    In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations of the complaint in the light most favorable to the plaintiff. The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.,* 85 N.C. App. 669, 670, 355 S.E.2d 838,

840 (1987). The Court construes the complaint liberally and accepts all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).

125. Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985); *see also Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

126. The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005). A "trial court can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Laster*, 199 N.C. App. at 577, 681 S.E.2d at 862. The Court can also ignore a party's legal conclusions set forth in its pleading. *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013).

   a. *Breach of Fiduciary Duty/Constructive Fraud.*

127. Plaintiffs make claims for breach of fiduciary duty and constructive fraud against all O&D Defendants, including Adams. In their briefs, Plaintiffs and Adams

argued and applied North Carolina law; however, under the internal affairs doctrine, Delaware law applies to Plaintiffs' claims against Adams for breach of fiduciary duty and constructive fraud. *Bluebird Corp. v. Aubin*, 188 N.C. App. 671, 680, 657 S.E.2d 55, 63 (2008); *Tong v. Dunn*, 2016 NCBC LEXIS 52, at *2 (N.C. Super. Ct. July 8, 2016) (applying Delaware law to former shareholders' breach of fiduciary duty claim against former directors).

128.    In order to establish a claim for breach of fiduciary duty under Delaware law, a plaintiff must show that (1) a fiduciary duty exists, and (2) the fiduciary breached that duty. *Estate of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011).

129.    Here, the allegations of the FAC are sufficient to state a claim for breach of fiduciary duty against Adams. There is no question that Adams, as a director of Consert, owed fiduciary duties to Plaintiffs as shareholders of Consert. *In re Nine Sys. Corp.*, C.A. No. 3940-VCN, 2014 Del. Ch. LEXIS 171, at *87 (Del. Ch. Sept. 4, 2014) ("Directors of Delaware corporations owe fiduciary duties of care and loyalty to the corporation and its stockholders."). Plaintiffs have alleged facts that, taken as true, are sufficient to show Adams breached his fiduciary duties. The duty of loyalty requires that a director act in the best interests of the corporation and its shareholders. *Id.* A director must put the interests of the shareholders above his own self-interest. *Id.* at *88. Plaintiffs allege that O&D Defendants, including Adams, put their financial and pecuniary interests above those of Plaintiffs in order to maximize O&D Defendants' return on the Merger. The Adams Motion to dismiss the breach of fiduciary duty claim should be DENIED.

130. Under Delaware law, "[c]onstructive fraud is simply a term applied to a great variety of transactions, having little resemblance either in form or nature, which equity regards as wrongful, to which it attributes the same or similar effects as those which follow from actual fraud[.]" *In re Wayport, Inc.*, 76 A.3d 296, 327 (Del. Ch. 2013). Constructive fraud exists to prevent wrongdoing by someone in a special position of confidence or trust, such as a fiduciary. *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 643 (Del. Ch. 2013). "[Delaware] corporate case law has thrown this concept [of constructive fraud] around in a not particularly precise way, but always in a context in which the court is examining whether directors have complied with their fiduciary duties." *Id.* (quoting *Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1236 (Del. Ch. 2001), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002)).

131. As the Court has concluded that the allegations of the FAC are sufficient to state a claim for breach of fiduciary duty, it follows that the allegations are also sufficient to state a claim for constructive fraud at the 12(b)(6) stage. The Adams Motion to dismiss Plaintiffs' constructive fraud claim should be DENIED.

        b. *Common Law Fraud/Fraudulent Inducement.*

132. Plaintiffs allege claims for fraud and fraudulent inducement against all Defendants, including Adams. Plaintiffs allege that "Defendants made numerous false statements of material fact, misrepresentations of material fact and concealed material facts from Plaintiffs" with "the intent and purpose of inducing Plaintiffs to forego their lawful rights as shareholders in Consert and consent to the sale and redemption of their stock in Consert." (FAC ¶¶ 109, 126.) Adams contends that

Plaintiffs have not alleged the fraud claims with sufficient particularity as required by Rule 9(b). Adams also contends that Plaintiffs' fraud claims should be dismissed because Plaintiffs have failed to allege that they relied on, and could not have reasonably relied on, Defendants' misrepresentations.

133. The parties have not discussed which state's substantive law applies to the fraud claims, but make their arguments based on North Carolina. Generally, North Carolina applies a lex loci to determine the law that governs tort claims such as fraud. *Harco Nat'l Ins. Co. v. Grant Thornton LLP*, 206 N.C. App. 687, 692, 698 S.E.2d 719, 722–23 (2010) ("Our traditional conflict of laws rule is that matters affecting the substantial rights of the parties are determined by lex loci, the law of the situs of the claim . . . . For actions sounding in tort, the state where the injury occurred is considered the situs of the claim." (quoting *Boudreau v. Baughman*, 322 N.C. 331, 335, 368 S.E.2d 849, 853–54 (1988))); *Camacho v. McCallum*, 2016 NCBC LEXIS 81, at *17 (N.C. Super. Ct. Oct. 25, 2016) ("The place of the injury is the state where the injury or harm was sustained or suffered—the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place, and the substantive law of that state applies."). Here, Plaintiffs make no allegation of any specific misrepresentation or concealment by Adams. Instead, the fraud claims are based primarily on misrepresentations and omissions made by Moore and Mowery at the Shareholders Meeting in Texas. Plaintiffs do not allege that Adams attended or participated in the Shareholders Meeting, and allege that only Worley out of the North Carolina-resident Plaintiffs attended the Shareholders Meeting. (FAC ¶ 76.)

Nevertheless, Plaintiffs argue that injury to the interests of North Carolina-resident Plaintiffs from Moore and Mowery's misrepresentations occurred in North Carolina. Accordingly, the Court will apply North Carolina law to Plaintiffs' fraud claims.

134. In North Carolina, "[t]o allege a claim for fraud, a plaintiff must plead: (1) [a] [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Birtha v. Stonemor, N.C., LLC*, 220 N.C. App. 286, 296, 727 S.E.2d 1, 9 (2012) (internal quotations omitted).[10]

135. Under North Carolina conflict of laws rules, procedural rights are determined by lex fori, the law of the forum. *Boudreau*, 322 N.C. at 335, 368 S.E.2d at 853–54. Accordingly, Rule 9(b) applies to Plaintiffs' claims for common law fraud and fraudulent inducement.

136. Rule 9(b) requires a party pleading fraud to allege the "time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981). "Mere generalities and conclusory allegations of fraud will not suffice." *Sharp v. Teague*, 113

---

[10] The elements of a claim for common law fraud are essentially identical under the laws of Texas and North Carolina. *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 612 (Tex. App. 2000) ("To prevail on a common-law fraud claim, a plaintiff must establish (1) the defendant made a material representation, (2) the representation was false, (3) the defendant either knew the representation was false when made or made it recklessly without any knowledge of its truth and as a positive assertion, (4) the defendant made the representation with the intention that it be acted upon, (5) the representation was in fact relied upon, and (6) damage to the plaintiff resulted.").

N.C. App. 589, 597, 439 S.E.2d 792, 797 (1994) (quoting *Moore v. Wachovia Bank & Tr. Co.*, 30 N.C. App. 390, 391, 226 S.E.2d 833, 835 (1976)).

137.   Regardless of which state's substantive law applies, Plaintiffs have failed to satisfy the pleading requirements of Rule 9(b). The FAC does not allege the time, place, or content of any misrepresentation or omission by Adams. Instead, Plaintiffs only allege specific misrepresentations by Moore and Mowery. Otherwise, Plaintiffs generally allege that Defendants made misrepresentations.

138.   Plaintiffs cannot rely on allegations of fraudulent misrepresentations by a group of defendants to support their fraud claims. *Julian v. Wells Fargo Bank, N.A.*, 2012 NCBC LEXIS 32, at *22 (N.C. Super. Ct. May 22, 2012). In *Julian*, the court held:

> Plaintiffs' allegations do not support claims of fraud or fraudulent inducement against Wells Fargo for several reasons. First, Plaintiffs' pleading of these claims does not conform to the specificity requirements of Rule 9(b). The Complaint does not allege the identity of an individual officer, employee, or agent of the bank who made any deceptive or misleading representation to Plaintiffs. In fact, Plaintiffs' allegations of fraud and fraud in inducement fail to specifically name Wachovia. Rather, Plaintiffs seek to incorporate Wells Fargo as a defendant in these claims through vague, general references to "Defendants' [collective] fraudulent misrepresentations . . . [and] inducements." These conclusory allegations do not meet the particularity requirements of Rule 9(b).

*Id.* at *21–22.

139.   Plaintiffs instead argue that because Adams was a member of the Board, which they allege acted in concert with each other and the other defendants, the allegations that Moore and Mowery made fraudulent misrepresentations should be sufficient to satisfy the particularity requirements of Rule 9(b) with respect to Adams.

(Pls.' Omnibus Opp'n Mots. to Dismiss Counts I–V 21–22.) Plaintiffs cite *Phillips and Jordan, Inc. v. Bostic*, 2009 NCBC LEXIS 3 (N.C. Super. Ct. June 2, 2009) in support, which states

> a plaintiff "must identify the particular individuals who dealt with him when he alleges that he was defrauded by a group or association of persons." In particular, even if a plaintiff "may not be privy to the workings of a group of defendants who have acted in concert to defraud him, . . . [it] can at least identify the particular defendants who allegedly dealt directly with him," and it can also "designate the occasions on which affirmative misstatements were made to [it]—and by whom[.]"

*Id.* at *14–15 (alterations in original) (citation omitted) (first quoting *Coley v. N.C. Nat'l Bank*, 41 N.C. App. 121, 125, 254 S.E.2d 217, 219 (1979); then quoting *Trussell v. United Underwriters, Ltd.*, 228 F. Supp. 757, 774 (D. Colo. 1964)).

140. To the extent that *Phillips and Jordan, Inc.* can be read to support the proposition that plaintiff satisfies the particularity requirements of Rule 9(b) and states a claim for fraud against an individual member of a group, such as a corporate director, by simply alleging that another member of the group made specific misrepresentations, the Court declines to extend such reasoning to the facts of this case. Here, Plaintiffs have not made any specific allegations regarding Adams—Plaintiffs have simply alleged that Adams was a member of the Board at the relevant time. The FAC does not allege that Adams took any specific actions as a director in support of the alleged fraudulent misrepresentations by Moore or Mowery. In fact, Plaintiffs do not even allege that Adams was present at or participated in the Shareholders Meeting at which Moore and Mowery allegedly made the misrepresentations.

141. The Court concludes that the allegations of the FAC do not satisfy the particularity requirements of Rule 9(b). The Adams Motion to dismiss the fraud claims should be GRANTED.

c. *Unfair and Deceptive Trade Practices.*

142. Plaintiffs allege a claim against all Defendants, including Adams, for violation of the North Carolina Unfair and Deceptive Trade Practices Act ("Act"). Again, Plaintiffs have not alleged any specific conduct by Adams individually that constituted an unfair or deceptive act.

143. To state a claim under the Act, "plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001).

144. Adams contends that Plaintiffs' claim should be dismissed because it is based exclusively on activity that occurred within Consert, and not activities involving other market participants. In *White v. Thompson*, 364 N.C. 47, 53, 691 S.E.2d 676, 680 (2010), the North Carolina Supreme Court held:

> Our prior decisions have determined that the General Assembly did not intend for the Act's protections to extend to a business's internal operations. . . . [T]he Act is not focused on the internal conduct of individuals within a single market participant, that is, within a single business. To the contrary, . . . the General Assembly intended the Act's provisions to apply to interactions between market participants. As a result, any unfair or deceptive conduct contained solely within a single business is not covered by the Act.

*Accord Alexander v. Alexander*, 792 S.E.2d 901, 904 (N.C. Ct. App. 2016) (quoting *White*, 364 N.C. at 52, 691 S.E.2d at 679); *Powell v. Dunn*, 2014 NCBC LEXIS 3, at *8 (N.C. Super. Ct. Jan. 28, 2014).

145. The facts in *Powell* are similar to the facts of this case. In *Powell*, plaintiffs were former common shareholders and defendants were former directors and preferred shareholders. *Powell*, 2014 NCBC LEXIS 3, at *2. The corporation merged with another corporation, and plaintiffs filed suit alleging that defendants breached their fiduciary duties to plaintiffs by structuring the merger to the preferred shareholders' benefit and to the common shareholders' detriment.

146. The court in *Powell* held that defendants' alleged unfair or deceptive conduct was not in or affecting commerce; "[r]ather, the alleged breaches of fiduciary duty owed to the common shareholders and the misrepresentations complained of were matters internal to [the company] and did not concern the company's interaction with other market participants in its regular, day-to-day activities." *Id.* at *11. The indirect involvement of an investment bank and other potential purchasers did not provide a basis for the Court to conclude the conduct was in or affecting commerce. *Id.* at *10.

147. Here, Plaintiffs allege that Defendants' conduct was unfair and deceptive because they structured the Merger to benefit themselves and to the Plaintiffs' detriment. Such conduct is wholly within Consert, a single business, and is not in or affecting commerce. The Adams Motion to dismiss Plaintiffs' claim for violation of the Act should be GRANTED.

d. *Conspiracy to Defraud.*

148.   As a fourth count, Plaintiffs allege that "Defendants agreed, colluded and conspired among themselves, and each intentionally performed one or more actions in furtherance of an illegal scheme to defraud Plaintiffs, which scheme or artifice included fraudulent inducement, constructive fraud, and common law fraud." (FAC ¶ 121.)

149.   The Court will apply North Carolina law to Plaintiffs' claim for conspiracy to defraud. *Stetser v. TAP Pharm. Prods. Inc.*, 165 N.C. App. 1, 16, 598 S.E.2d 570, 581 (2004) ("[T]he substantive law of the state where the injury occurred would be applied to the plaintiffs' claims for . . . civil conspiracy and tortious concert of action.").

150.   It is well-settled that there is no independent cause of action for conspiracy. *Toomer v. Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d 76, 92 (2002). "[O]ur law nevertheless permits one defrauded to recover from anyone who facilitated the fraud by agreeing for it to be accomplished." *Neugent v. Beroth Oil Co.*, 149 N.C. App. 38, 53, 560 S.E.2d 829, 838–39 (2002) (citing *Nye v. Oates*, 96 N.C. App. 343, 346–47, 385 S.E.2d 529, 531 (1989)). "The elements of facilitating fraud are: (1) that the defendants agreed to defraud plaintiff; (2) that defendants committed an overt tortious act in furtherance of the agreement; and (3) that plaintiff suffered damages from that act." *Id.* To state a claim for civil conspiracy, "[t]he pleader must . . . allege the facts from which the alleged conspiracy may be inferred and the alleged unlawful acts agreed upon." *Thomas & Howard Co. v. Am. Mut. Liability Ins. Co.*, 241 N.C. 109, 115, 84 S.E.2d 337, 341 (1954). "[A]llegations that the plaintiff sustained a loss 'by the

dishonesty and/or fraud' of one or more of its defendant employees, and that the individual defendants acted 'in collusion and/or conspiracy' with each other are mere conclusions, and not sufficient." *Id.*; *Kirby v. Reynolds*, 212 N.C. 271, 284, 193 S.E. 412, 420 (1937) ("There is no direct or circumstantial allegation in the complaint to show any conspiracy between [defendants] to injure plaintiff. The allegations in the pleadings, 'their wanton, willful, malicious, and unlawful combine, conspiracy, confederation, and agreement to injure this plaintiff,' etc., are not borne out by the long details of the pleadings, and were merely conclusions of the pleader and not considered on a demurrer.").

151.  The FAC alleges that Defendants "agreed, colluded and conspired among themselves . . . to defraud Plaintiffs, which scheme or artifice included fraudulent inducement, constructive fraud, and common law fraud" (FAC ¶ 121), but does not allege any facts explaining how Adams was involved in the conspiracy or that Adams entered into an agreement with the other Defendants. The FAC generally states that "Defendants Roberts and Moore, acting individually and in concert with other defendants, devised and executed a scheme . . . which had the purpose and effect of disenfranchising certain shareholders, including Plaintiffs." (FAC ¶ 33.) In addition, under the heading "Defendants' Illegal and Fraudulent Scheme," the FAC alleges that "Defendants Roberts and Moore . . . devised a scheme to sell Consert to a third party in a manner that would illegally maximize the returns on their personal investments in Consert, and the investments of certain other officers, directors, and investors" to Plaintiffs' detriment. (FAC ¶ 40.) There are no allegations that Adams took any action

in furtherance of the Scheme, or that Adams received any benefit from the Scheme, from which the Court can infer a meeting of the minds between Adams and any other Defendants.

152. Plaintiffs allegation that "Defendants agreed, colluded and conspired among themselves . . . to defraud Plaintiffs" is a legal conclusion and, with regard to Adams, is not supported by any facts that show his agreement to the alleged conspiracy. *Jackson v. Blue Dolphin Commc'ns of N.C., L.L.C.*, 226 F. Supp. 2d 785, 791 (W.D.N.C. 2002) ("[T]he Plaintiff has failed to allege any facts that support an agreement among the Defendants. Her allegation that Defendants "conspired" is conclusory and relies only upon suspicion and conjecture. Because of the conclusory nature of the allegation, the Plaintiff has failed to state a claim upon which relief may be granted."). The Adams Motion to dismiss Plaintiffs' civil conspiracy claim should be GRANTED.

### III.   CONCLUSION

153. For the foregoing reasons, the Court hereby **ORDERS** as follows:

   a. The Court **GRANTS** the Kellen Motion and **DISMISSES** Defendant Kellen for lack of personal jurisdiction.

   b. The Court **GRANTS** the Baker, Brown, and McCamant Motion and **DISMISSES** Defendants Baker, Brown, and McCamant for lack of personal jurisdiction.

   c. The Court **GRANTS** the Kerr Motion and **DISMISSES** Defendant Kerr for lack of personal jurisdiction.

d.  The Court **GRANTS** the Moore and Roberts Motion and **DISMISSES** Defendants Moore and Roberts for lack of personal jurisdiction.

e.  The Court **GRANTS** the Mowery and Stephens Motion and **DISMISSES** Defendants Mowery and Stephens for lack of personal jurisdiction.

f.  The Court **GRANTS** the Alamo Motion and **DISMISSES** Defendant Alamo for lack of personal jurisdiction.

g.  The Court **GRANTS in part** and **DENIES in part** the Adams Motion. The Court **DISMISSES** Plaintiffs' claims against Defendant Adams for common law fraud, fraudulent inducement, unfair and deceptive trade practices, and conspiracy to defraud with prejudice. The Court **DENIES** the Adams Motion as to Plaintiffs' claims against Defendant Adams for breach of fiduciary duty and constructive fraud.

This the 28th day of February, 2017.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases